**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TETRA TECHNOLOGIES, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | Civil Case No.: |
| | § | 4:25-cv-001468 |
| KENT BROWN, SHANNON | § | |
| KILGORE, PURECHEM LLC, SEA- | § | _____ |
| TEX RESOURCES LLC AND | § | |
| FLATLINE GROWTH INITIATIVES | § | |
| LLC. | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF TETRA TECHNOLOGIES, INC.'S VERIFIED COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION

Plaintiff TETRA Technologies, Inc. ("TETRA") files this Verified Complaint[1] and Application for Temporary Restraining Order, Preliminary Injunction and Permanent Injunction against Defendants Kent Brown ("Brown"), Shannon Kilgore ("Kilgore"), Purechem LLC ("Purechem"), Sea-Tex Resources LLC ("Sea-Tex"), and Flatline Growth Initiatives LLC ("Flatline") and respectfully shows the Court as follows:

### I.    INTRODUCTION

1.    Kent Brown and Shannon Kilgore are former TETRA employees. Brown resigned on March 14, 2025, and Kilgore resigned effective December 27, 2024.  Unknown to TETRA, Kilgore formed Sea-Tex on August 19, 2020. Kilgore also created a Sea-Tex business plan in 2023

---

[1] The factual allegations in subsections A-F are verified by the declaration of Tim Moeller, attached as Exhibit A, and by certain declarations as indicated below.

on TETRA's computer system that shows that Sea-Tex would sell calcium chloride, which is directly competitive with TETRA.

2.    Also unknown to TETRA, Brown formed Flatline on September 5, 2023. Days later, on September 21, 2023, Sea-Tex and Flatline created Purechem. Purechem sells potassium chloride, in direct competition with TETRA and magnesium chloride, which competes with TETRA's sales of calcium chloride. https://purechemllc.com/products. Further, currently, Sea-Tex sells calcium chloride to former TETRA customers, also in direct competition with TETRA. Brown and Kilgore formed these companies to compete, at least in part, with TETRA, despite the fact that they were working for TETRA and pretending to be loyal TETRA employees. Further, at least as early the end of 2023, throughout 2024, and into 2025 (as to Brown only), Brown and Kilgore actually competed with TETRA using Purechem and Sea-Tex while employed.

3.    Further, at various times during their employment with TETRA, Brown and Kilgore surreptitiously misappropriated TETRA trade secret and confidential information. In fact, as discussed in more detail below, they began exfiltrating TETRA confidential and trade secret information at least as early as 2023.  More specifically, and by way of example only, on March 12, 2025, two days before his resignation and last day with TETRA, Brown used his TETRA laptop to copy a large amount of TETRA confidential and trade secret information to his personal email address kbrownka7904@aol.com by depositing that information into multiple draft messages in Brown's AOL "drafts" folder. Brown and Kilgore also both used their TETRA email accounts and multiple USB devices to take TETRA confidential and trade secret information from TETRA.

4.    Fundamentally, Brown and Kilgore violated contractual, statutory and common law duties to TETRA by competing with TETRA during their employment, stealing its confidential

and trade secret information to use to compete with TETRA illegally, and diverting TETRA opportunities during their employment with TETRA. Brown and Kilgore, along with their entities, Flatline, Sea-Tex, and Purechem, have engaged in multiple violations of the Defend Trade Secrets Act, among other laws, to conspire to commit fraud on TETRA using their employment at TETRA as cover to commit various illegal acts. All Defendants have also tortiously interfered with TETRA's contractual or business relationships with its suppliers and customers.

5.     TETRA sues Brown, Kilgore, and the other Defendants for trade secret misappropriation under the Defend Trade Secrets Act, breach of contract (Brown and Kilgore only), breach of fiduciary duty (Brown and Kilgore only), violations of the Racketeer Influence and Corrupt Organizations (RICO) Act, and tortious interference with contractual and business relationships, among other causes of action.

6.     TETRA seeks multiple forms of relief in this case. For conduct that has occurred in the past, including, but not limited to, Brown and Kilgore's competition with TETRA during their employment that resulted in their diversion of business opportunities away from TETRA, TETRA seeks monetary damages. Since injunctive relief cannot address harm that has occurred in the past, monetary damages are the only available remedy to address the damages TETRA has suffered due to Defendants past illegal conduct.

7.     To prevent harm that is currently occurring and that will occur in the future, including, but not limited to, Defendants' misuse of TETRA's confidential and trade secret information to compete unfairly with it and Defendants' unjust enrichment in benefiting from their illegal conduct at TETRA's expense, TETRA seeks a temporary restraining order, preliminary and permanent injunctive relief, including an order:

a.  Requiring Defendants to immediately produce to TETRA's third-party computer forensics expert David A. Brown, at CyberEvidence, for forensic imaging and analysis all computers, computer systems, USB devices and other devices that have ever contained any TETRA information;

b.  Requiring Defendants to immediately produce all TETRA confidential and trade secret information in their possession, custody or control that is not on any of the above identified computers and devices to TETRA's third-party computer forensics expert David A. Brown, at CyberEvidence;

c.  Requiring Defendants to immediately cease all use and disclosure of TETRA confidential and trade secret information, whether tangibly in their possession or not;

d.  Requiring Defendants to immediately cease doing business with all business relationships, whether customers, suppliers, or vendors, that they learned of while employed by TETRA and are currently doing business with, or have attempted to do business with; and

e.  Requiring Defendants to refrain from the destruction of any evidence potentially relevant to TETRA's Complaint.

## II.    THE PARTIES

8.    Plaintiff TETRA Technologies, Inc. is a Delaware Corporation with its principal place of business in Montgomery County, Texas.

9.    Defendant Kent Brown is a resident of Magnolia, Texas.

10.    Defendant Shannon Kilgore is a resident of Harris County, Texas.

11.    Defendant Purechem LLC is a Limited Liability Company with its principal place of business in Houston, Texas. Its members are Defendant Sea-Tex LLC and Defendant Flatline Growth Initiatives LLC.

12.    Defendant Sea-Tex LLC is a limited liability company located in Houston, Texas. Shannon Kilgore is Sea-Tex's sole member.

13.    Defendant Flatline Growth Initiatives LLC is a limited liability company located in Englewood, Florida.  Kent Brown is its sole member.

## III.    JURISDICITION AND VENUE

14.    The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1331 because two of Plaintiff's claims arise under federal law: (1) The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; and (2) The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*. The Court has jurisdiction over TETRA's other claims in this lawsuit pursuant to 28 U.S.C. § 1367(a).

15.    The Court has personal jurisdiction over the Defendants who reside in Texas, and the Court has personal jurisdiction over Flatline because Kent Brown, a Texas resident, is this LLC's sole member and because of Flatline's involvement in the conspiracy described in this Complaint, including any specific acts to further Defendants' illegal misappropriation of TETRA's Trade Secret Information and other illegal conduct.

16.    Venue is proper in this district pursuant to the provisions of 28 U.S.C. §§ 1391(a)(2), 1391(b) and 1391(d), because a substantial part of the events giving rise to these claims occurred in this district.

## IV.    FACTUAL BACKGROUND

**A.    TETRA's Business and Protection of its Confidential Information.**

17.    TETRA is a leading industrial chemical and oil and gas service company focused on the manufacture of completion fluids and related products. It also sells various chemicals for well completion, water management, fracking flowback, production well testing,  and compression and other services.

18.    TETRA is a worldwide leader in the manufacturing and marketing of liquid and dry calcium chloride products globally. TETRA supplies calcium chloride, potassium chloride and other fluids to be used in a variety of applications, including water treatment processes, industrial,

oil and gas, construction and food processing, manufacturing, and agriculture. TETRA also operates five calcium chloride manufacturing facilities in the U.S. and Finland. TETRA also does its business at times using third party suppliers for finished product as well as to transport the products it sells.

19.    In conducting its business, TETRA has invested and continues to invest significant time, money, and energy in maintaining and developing its confidential and trade secret information, including, but not limited to, information about: (a) its customers, including preferences, contact information complied in lists and contacts folders, pricing, historical sales, cost and margin information; (b) information about its suppliers including the terms of contracts with suppliers, the availability and cost of certain chemicals used in TETRA's business, including calcium, magnesium, and potassium chlorides; (c) information about its vendors, including the costs of product, logistics companies and pricing used to transport the chemicals TETRA sells to its customers and (d) technical and financial information, including profit, cost, and margin information, loss data, and research pertinent to developing market strategies.

20.    TETRA's creation, accumulation and application of its confidential and trade secret information is critically important to TETRA's continuing successful, and profitable, development of its relationships with its customers and suppliers.  Thus, TETRA takes significant steps to protect its confidential and trade secret information.

21.    Only certain individuals within TETRA, with a legitimate business need to access and use the information on TETRA's behalf, have access to TETRA's confidential and trade secret information. Additionally, TETRA's employees – including Brown and Kilgore while employed with TETRA – acknowledge TETRA's policies regarding the allowable use of its electronic systems and protection of its confidential and trade secret information.

22.     Specifically, TETRA employees must protect and make proper use of TETRA assets:

> **You are a steward of TETRA's assets. As such, you have the obligation to (i) use and maintain these assets with the utmost care and respect to conduct TETRA business; (ii) protect and preserve TETRA's assets and resources against loss, theft, waste, abuse, or other misuse; and (iii) assist TETRA in its efforts to control costs.** TETRA's assets include, but are not limited to, such things as electronic mail, computer system, documents, equipment, facilities, information, TETRA's logo and name, materials, and supplies.

*See* Exhibit B, TETRA Code of Conduct, at p. 4 (emphasis in original).[2]

23.     TETRA employees also have an obligation to protect and keep confidential the Company's trade secrets and commercially sensitive business information. *Id.* at p. 4. TETRA's Code of Conduct specifically identifies the types of information that TETRA treats as confidential and/or trade secret:

> Confidential proprietary information includes all non-public information that may be useful to competitors or that could be harmful to the Company, its customers, or its suppliers if disclosed. Confidential proprietary information includes, but is not limited to, historical or projected future financial information or results of operation, details of contracts with customers or suppliers, information regarding the existence or terms of any potential dispositions or acquisitions by TETRA, personnel information (including employee medical information and information relating to any and all aspects of employee compensation), intellectual property (such as trade secrets, patents, trademarks, and copyrights), ideas, discoveries, designs, inventions, technology, improvements, know-how, manufacturing and services, processes, design specifications, writings and other works of authorship, computer programs, accounting information, organizational structure, marketing plans, customer or supplier lists and data pricing information, objectives, strategies, business plans or methods, and the like that relate in any manner to the actual or anticipated business of TETRA.

*Id.*

---

[2] Brown and Kilgore acknowledged receiving, reading, and agreeing to comply with TETRA's Code of Conduct. *See* Ex. B.

24.     TETRA's Code of Conduct unequivocally prohibits disclosure or misuse of TETRA's confidential and trade secret information. *Id.* And TETRA's Code of Conduct also states that employees have an obligation to protect TETRA's confidential and trade secret information after their employment with TETRA ends. Further, TETRA's Code of Conduct requires that employees return all TETRA information upon termination of employment:

> **Your obligation to protect the Company's confidential proprietary information continues even after you leave the Company, and you must return all proprietary information in your possession upon leaving the Company.**

*Id.* (emphasis in original).

25.     TETRA employees further have an obligation articulated in TETRA's Code of Conduct to safeguard the confidential, proprietary, or trade secret information of other companies, including TETRA's suppliers, contractors, or employees, and are prohibited from using any confidential proprietary information of TETRA's suppliers, contractors, customers, or employees for personal use of to benefit a third party:

> **TETRA also respects the property rights of other companies and requires Company Personnel to observe such rights.** TETRA strictly prohibits the use or disclosure of any confidential, proprietary, or trade secret information of others, even if such information comes to you or TETRA through legitimate channels, a previous employer, competitor, or vendor, unless so authorized in writing by the owner of the information. You must not obtain information about TETRA's competitors through unlawful or unethical means, such as theft, bribery, illegal entry, or electronic eavesdropping. You must also not use confidential proprietary information of TETRA's suppliers, contractors, customers, or employees for personal use or to benefit a third party.

*Id.* (emphasis in original).

26.     Further, TETRA's "Use of Company Provided Computers, CELL PHONES, and Related Facilities" policy ("Computer Use Policy")[3]  requires employee to "exercise a great degree

---

[3] Brown and Kilgore acknowledged receiving, reading, and agreeing to comply with TETRA's Computer Use Policy. *See* Ex. C.

of caution in transmitting Company trade secrets or other confidential information on the E-mail system than with other means of communication because of the reduced effort required to redistribute such information, and such sensitive information should not be sent or forwarded to other employees inside the Company who do not have a need to know the information." *See* Exhibit C, Computer Use Policy, at 4.

27.    Because TETRA takes extensive measures to protect its confidential information and trade secrets, TETRA also requires its employees to place a legend in all capital letters at the top of a message containing confidential information advising of the information's confidentiality and prohibiting any unauthorized use of disclosure. *See id*.

**B.    Brown and Kilgore's Employment with TETRA.**

28.    Kent Brown was TETRA's Director of Sales until his resignation on March 14, 2025.  Brown's duties as TETRA's Director of Sales included, among other products, North American sales for calcium chloride. The North American sales team, comprised of five employees, reported to Brown.   The Customer Service team also reported to Brown, including one supervisor and three other TETRA employees.

29.    Shannon Kilgore was one of Brown's Sales Managers, selling almost exclusively calcium chloride, and supported TETRA's Arkansas drilling operations. Kilgore had one employee reporting to him. Kilgore resigned from TETRA around December 27, 2024.

30.    Both Brown and Kilgore entered into enforceable employment contracts with TETRA that contained the following provisions relevant to the allegations in this Complaint:

> 6. While employed by TETRA, the EMPLOYEE shall not, under any circumstances, be directly or indirectly connected with or concerned in any other business which competes in any way with TETRA or any of the TETRA companies.  This includes passive investments such as stock ownership. (Reference: Conflict of Interest Policy.)

7.   The EMPLOYEE recognizes that his or her position with TETRA is one of high trust and confidence by reason of the EMPLOYEE's access to TETRA's trade secrets and confidential information.  In consideration  of such access, the EMPLOYEE agrees to (i) adhere by the TETRA Confidential Information Policy and (ii) use his or her best efforts and exercise the utmost diligence to keep absolutely secret and protect and safeguard the trade secrets and confidential information owned or possessed by TETRA.  Except as may be required in connection with and during the EMPLOYEE's employment by TETRA, or with the express written permission of TETRA, the EMPLOYEE shall not, **either during or after his or her employment with TETRA,** directly or indirectly, use for his or her own benefit or for the benefit of another, or disclose to another, any trade secret or confidential information (whether or not acquired, learned, obtained or developed by the EMPLOYEE alone or in conjunction with others) of TETRA, its customers, contractors or others with whom TETRA has business relationships. A few examples (but not an exhaustive list) of information which the EMPLOYEE must always maintain as confidential are (i) TETRA's manufacturing, engineering and scientific know-how, formulas, inventions, discoveries and improvements relating to TETRA's products, services or operations, (ii) TETRA's customer lists or other customer information, (iii) any and all financial information about TETRA including methods of pricing, and (iv) information received from another company with which TETRA and its  employees are bound by contract or a "secrecy or confidentiality agreement".  The EMPLOYEE further agrees that all memoranda, notes, records, drawings, and other documents made or compiled by the EMPLOYEE while employed by TETRA concerning any process, method, technique, equipment, apparatus or product manufactured, used, developed, investigated or considered by TETRA or concerning any other TETRA activity, whether confidential or not and in whatever form, whether written or electronically stored, shall be the property of TETRA and shall be delivered to TETRA upon termination of the EMPLOYEE's employment  with TETRA for any reason or at any time upon request of TETRA, as well as all other property of TETRA.

*See* Exhibits D and E (Brown and Kilgore Employment Agreements).

## C.    **Brown and Kilgore's Formation of Companies to Compete with TETRA.**

31.   According to Sea-Tex's Certificate of Formation, Shannon Kilgore is its sole Managing Member, and he caused its formation on August 19, 2020.  *See* Exhibit F. Sea-Tex's business address is the same as Shannon Kilgore's home address in Houston, Texas.

32.     In the course of its investigation, TETRA was able to recover a Sea-Tex Resources, Inc. "Business Proposal 2023" (the "Sea-Tex Business Proposal") from its computer system. That Business Proposal states the same address for Sea-Tex Resources, Inc. as the address for Sea-Tex Resources LLC. It describes Sea-Tex's business as "the local deliveries of Calcium Chloride products along the Gulf Coast Region of the Untied (sic) States. Sea-Tex Resources Inc. will identify and target potential customer in the chemical sector."[4]

33.     The Sea-Tex Business Proposal states that Shannon Kilgore is Sea-Tex's President and that Dr. McKensie Kilgore, Kilgore's spouse, serves as the company's COO. The Business Proposal also contains a detailed "Competitive Market Analysis Summary" discussing the calcium chloride market, even including statistics and "expert" predictions. It further discusses calcium chloride "key characteristics" and "growth factors."

34.     Flatline's formation documents reveal that Kent Brown formed it in Florida on September 5, 2023.  *See* Exhibit G. Flatline's business address is the address of Kent Brown's second home in Englewood, Florida and Brown is listed as the Registered Agent. Flatline does not appear to have been formed to compete directly with TETRA.

35.     Purechem's formation documents show that it was created on September 21, 2023, as a Texas Limited Liability Company.  *See* Exhibit H. Purechem's Certificate of Formation shows that Sea-Tex and Flatline are its only two Managers. *Id*. In a Certificate of Correction, Purechem changed its registered office address to Shannon Kilgore's home address in Houston, Texas. *See* Exhibit I.

---

[4] Ironically, the Sea-Tex Business Proposal states that the information in it is "highly sensitive and confidential." While Kilgore obviously had no right to conduct this business during his employment with TETRA and forfeited any right to confidentiality/privacy he had by using TETRA's computer system to do this "work," TETRA is not including the Business Proposal as an exhibit to this lawsuit, but will share it with the Court *in camera* at the Court's request.

36.     Purechem, however, like Sea-Tex, is competitive with TETRA. As shown on its website, Purechem sells magnesium chloride and potassium chloride. https://purechemllc.com/products. Purechem's sales of potassium chloride are directly competitive with TETRA.  Purechem's sales of magnesium chloride are indirectly competitive with TETRA because magnesium chloride often competes with calcium chloride.

37.     TETRA contends that Brown and Kilgore, through Sea-Tex and Flatline, formed Purechem to compete with TETRA. TETRA further contends that Kilgore formed Sea-Tex to compete with TETRA, as the Sea-Tex Business Proposal reveals.  Further, Brown and Kilgore formed these companies during their employment with TETRA, long before either of them resigned from TETRA.

**D.     Brown and Kilgore's Competitive Conduct During Their Employment with TETRA.**

38.     TETRA's Code of Conduct prohibits its employees from engaging in, or giving the appearance of engaging in, any activity involving a conflict, or reasonably foreseeable conflict, between the interests of the employees and those of TETRA. *See* Ex. B at 6.

39.     TETRA also requires its employees to follow a detailed "Conflicts of Interest" policy.[5] *See* Exhibit J, Conflicts of Interest Policy. Under the policy, "[e]ach employee is responsible for disclosing any contemplated or existing activity, interest or relationship that could impair his or her objectivity, judgment or effectiveness as an employee of the Company." *Id.* Similar to the Employment Agreements, TETRA's Conflicts of Interests policy explicitly prohibits outside work by an employee for a present or prospective competitor, customer, or supplier of the Company. *Id.*

---

[5] Brown and Kilgore acknowledged their familiarity with and review of TETRA's conflicts of interest policy. *See* Exhibit J.

40.     Notwithstanding the obligations in the Employment Agreements and TETRA's policies, Brown and Kilgore repeatedly used their TETRA-issued computers to send and receive communications related to their businesses. As early as August 2021, Kilgore emailed Brown on their TETRA email accounts asking whether Brown had any update on the "Sea-Tex opportunity that Joey was mentioning a couple weeks back." *See* Exhibit K.

41.     Since Purechem's formation in 2023, Brown and Kilgore each, apparently accidentally, used the following Purechem email addresses while conducting TETRA business: skilgore@purechemllc.com and kbrown@purechemllc.com. For example, on December 13, 2023, Kent Brown instructed a business contact ("CG") to "[p]lease remove this email address from anything related to Tetra."  *See* Exhibit L.  Brown was referring to his purchemll.com email account. The emails below Brown's request pertained to a discussion about an order related to calcium chloride.

42.     Similarly, on August 21, 2024, a TETRA customer ("LL") apparently accidentally copied Kilgore's Purechem email address in a group email, saying in an email to Kilgore only, "[s]ent it to the wrong email on this stupid phone. Please see below." *See* Exhibit M. A review of the email chain shows that it appears to refer to TETRA business being conducted with a TETRA customer, with the customer having accidentally used Kilgore's Purechem email address.

43.     On January 3, 2025, Brown responded to an email from JL, a Marketing Director for a distributor, that is also a TETRA customer.  *See* Exhibit N.[6]  The subject of this email is "PureChem – Account #113019-00." In this email chain, at the bottom, there is an internal discussion between the distributor's employees, referring to "our phone conversation on

---

[6] To protect the distributor's privacy, TETRA is including a redacted version of this email as an exhibit to its Complaint but will share it fully with the Court *in camera* at the Court's request.

PureChem," stating, "the account was set up in May 2024 . . .." The email also discusses tax exemptions for the "customer," and notes an address that appears to be the same as Sea-Tex's address. Ultimately, the distributor included Kent Brown in the email chain, but used his TETRA email address. Brown replied saying, "I think you might have meant to send this to someone else."

44.     During 2023 and 2024, TETRA had a two-year agreement (the "Mainstream Agreement") with Mainstream Aquo Solutions, LLC ("Mainstream") that was set to expire on January 1, 2025. Mainstream sourced liquid calcium chloride from Honeywell International ("Honeywell")'s Baton Rouge, Louisiana plant, and then acted as broker by selling it to TETRA, who then provided the product to its end user customers. TETRA's contract with Mainstream had a termination date of December 31, 2024, so it was important for TETRA to work to renew that contract.

45.     On September 27, 2024, Brown, as Director of Sales and TETRA's lead negotiator on the Mainstream Agreement renewal, sent Mainstream an offer to begin discussions on the renewal specifics, purportedly on behalf of TETRA.

46.     During these negotiations with Mainstream, in an email dated October 3, 2024, when discussing a response to Mainstream's counteroffer, Brown advised Tim Moeller ("Moeller"),  TETRA's Senior Vice President of Global Supply Chain and Chemicals, and others, that TETRA should articulate a hard "no" to Mainstream's offer without offering a counter proposal, falsely claiming that delaying the negotiations would provide "more leverage" to TETRA.

47.     Until mid-November 2024, Brown was the only TETRA employee leading negotiations with Mainstream over the agreement renewal.  However, Moeller grew concerned

with Brown's lack of progress in securing a renewal agreement by the expiration date. Because of that, Moeller injected himself into the discussions with Mainstream.

48.    Also in mid-November 2024, while still a TETRA employee, Kilgore visited the office of Brady Achee, the President and owner of Triad Environmental Services, LLC ("Triad"). *See* Exhibit O, Declaration of Brady Achee ("Achee Dec.") at ¶¶ 2, 4. Triad transports calcium chloride, among other products, from various sources to end-user customers. Achee Dec. at ¶ 2. During and before 2024, Triad transported calcium chloride for TETRA from Mainstream to various TETRA customers. *Id.*

49.    During Achee's meeting with Kilgore, Kilgore informed Achee that his company, Sea-Tex, was anticipating receiving the Mainstream calcium chloride that TETRA was currently receiving. Achee Dec. at ¶ 4. TETRA was unaware of this meeting and its contents at the time it took place.

50.    During TETRA's negotiations with Mainstream in November and December 2024, Brown, posing as a loyal TETRA fiduciary, was heavily involved in the internal discussions relating to TETRA's pricing goals for the renewal, the impact of pricing changes on TETRA's financials, and other extensive confidential discussions surrounding TETRA's interests and capabilities in securing the Mainstream Agreement renewal.

51.    With the Mainstream contract's expiration date swiftly approaching, and no apparent agreement between the parties in sight, Moeller repeatedly reached out to Mainstream personally and also asked Brown to reach out in the hopes of securing the agreement renewal before the end of the year.

52.    While Brown was giving the appearance that he was negotiating for the best interests of TETRA, Brown and Kilgore were colluding to derail TETRA's agreement renewal.

53.     In December 2024, Kilgore abruptly notified TETRA that he would resign from TETRA effective December 27, 2024.

54.     On December 30, 2024, before any final decision had been reached by the parties regarding the Mainstream contract's renewal, Brown emailed the "Customer Service" email address of TETRA: "Ladies, your wish may have come true. It looks like we won't have the HW [Honeywell] stream in 2025." *See* Exhibit P.

55.     Brown, obviously, was correct. TETRA failed to secure a renewal of the Mainstream contract, thus losing the calcium chloride supply from Mainstream effective January 1, 2025. Ultimately, TETRA failed to secure a renewal of the Mainstream contract, thus losing the calcium chloride supply from Mainstream effective January 1, 2025.

56.     On January 1, 2025, Kilgore started doing business with Triad on behalf of Sea-Tex for transportation of the Mainstream calcium chloride production which was now under Kilgore's control. *See* Achee Dec. at ¶ 5. Triad began transporting for Sea-Tex calcium chloride sourced by Mainstream to some of the same customers Triad had previously serviced when transporting the same Mainstream production for TETRA. Achee Dec. at ¶ 8.

57.     Further, while Kilgore was initially Sea-Tex's sole representative to Achee and Triad, in January 2025, Brown, while still employed at TETRA, began contacting Achee to discuss Sea-Tex's calcium chloride stream from Mainstream. Achee Dec. at ¶ 7. Brown even asked Achee to keep Brown's involvement with Sea-Tex a secret due to his employment with TETRA. *Id.*

58.     In January 2025, after losing the contract renewal and after Kilgore's resignation immediately before the negotiation impasse, Moeller repeatedly asked Brown whether Kilgore had control of the Mainstream production or was working with someone who did. Brown, lying to

Moeller, claimed that Brown did not know whether Kilgore controlled the production and had not heard anything related to Kilgore's connections to Mainstream production.

59.    In February 2025, TETRA started receiving reports that Brown and Kilgore were working together, while Brown was still employed at TETRA, and that Brown was actively supporting both soliciting of business as well as helping to coordinate Sea-Tex's operations. At that point, TETRA began its efforts to investigate Brown and Kilgore's conduct.

60.    On March 13, 2025, Brown emailed a client, stating "TETRA is not able to meet your needs at this time, but I am going to pass your information along to a company that may be able to help you." As noted above, Brown resigned from TETRA, effective immediately, on March 14, 2025. *See* Exhibit Q.[7]

**E.    Brown's Use of TETRA's Computer Systems to Compete and to Misappropriate TETRA's Trade Secrets.[8]**

61.    TETRA's Computer Use Policy sets specific standards and responsibilities for TETRA employees' use of TETRA's computing and communication facilities. *See* Ex C. Employees are prohibited from using the Company's computing and communication facilities to send, upload, receive, or download software or other copyrighted materials or trade secrets, proprietary financial information, or similar material without prior authorization. *Id.* at 2.

62.    TETRA also prohibits its employees from *adding*, *removing*, or *modifying* a hardware component, such as a removable external device, within TETRA's computing and

---

[7]  To protect TETRA's customer information, TETRA is only including a redacted version of this email as an exhibit to this lawsuit, but will share it with the Court *in camera* at the Court's request.
[8]  TETRA has not attached any of the trade secret documents to this Complaint, since it would have to seal them. Instead, TETRA offers to produce the documents that Defendants misappropriated *in camera* should the Court so request.

communications facilities without prior authorization to TETRA and prior notification to TETRA's Information Technology department. *See id.*

63.    TETRA engaged David Brown of CyberEvidence to conduct a forensic investigation into Brown's and Kilgore's computer related conduct during their TETRA employment. *See* Exhibit X, Declaration of David Brown ("David Brown Dec.") at ¶ 3. David Brown's investigation revealed that Kent Brown and Shannon Kilgore used their access to TETRA's computers and computer systems to form competing businesses and misappropriate TETRA's Trade Secret Information. *See generally,* David Brown Dec. David Brown's investigation was aided by TETRA's use of Veriato (https://veriato.com), a software program TETRA installed that monitors user activity on a computer network by taking periodic screenshots. *Id.*

64.    As early as September 2023, Brown was using TETRA's computers to do "work," associated with Sea-Tex and Purechem:

| File Path | File Created (Central) | File Last Modified (Central) |
|---|---|---|
| C:\Users\kbrown\Downloads\230921 Purechem LLC - Multi-Member LLC - Manager Managed UNANIMOUS WRITTEN CONSENT (1).docx | 10/22/2023 11:04:40 AM | 10/22/2023 11:04:41 AM |
| C:\Users\kbrown\Downloads\230921 Purechem LLC Company Agreement.docx | 10/09/2023 7:45:34 PM | 10/09/2023 7:45:35 PM |
| C:\Users\kbrown\Downloads\document.pdf | 09/01/2023 1:35:22 PM | 09/01/2023 1:35:22 PM |
| C:\Users\kbrown\Downloads\f2553.pdf | 10/27/2023 10:01:23 AM | 10/27/2023 10:01:23 AM |
| C:\Users\kbrown\Downloads\Financial Account Authorization Letter.pdf | 09/07/2023 11:40:51 AM | 09/07/2023 11:40:52 AM |
| C:\Users\kbrown\Downloads\LLC Articles OR Certificate of Organization.pdf | 09/07/2023 11:42:22 AM | 09/07/2023 11:42:22 AM |
| C:\Users\kbrown\Downloads\Sea-Tex Resources BPlan.docx | 09/07/2023 12:02:15 PM | 09/07/2023 12:02:16 PM |
| C:\Users\kbrown\Downloads\Welcome Packet.pdf | 09/07/2023 11:37:14 AM | 09/07/2023 11:37:14 AM |

David Brown Dec. at ¶ 11.

65.     On October 17, 2023, after Purechem's formation, Brown sent to his personal AOL email account a document containing TETRA's Master Safety Data Sheet ("MSDS") for magnesium chloride flakes. David Brown Dec. at ¶ 13. While the MSDS does not necessarily contain TETRA confidential and trade secrets information, it represents an investment of TETRA time and money that belongs solely to TETRA.

66.     From March 3 through March 14, as shown by the screenshot below, taken from David Brown's declaration, Brown connected multiple external USB devices to his password protected, TETRA-issued computer. David Brown Dec. at ¶ 11.b.

| Device Description | Electronic Serial Number | Last Connected (Central) |
|---|---|---|
| Apple iPhone | 000081200006190E1442601E | 03/03/2025 1:12:06 PM |
| Linux File-Stor Gadget USB Device | ASQ623H0014A1802737 | 03/03/2025 6:32:53 PM |
| Generic  Mass-Storage | 5&39858257&0&3 | 03/12/2025 10:32:59 AM |
| Generic  Mass-Storage | 5&39858257&0&6 | 03/14/2025 11:23:04 AM |
| Generic Mass-Storage USB Device | 6&f40c663 | 03/14/2025 1:05:21 PM |

67.     On March 12 and 14, Brown used his TETRA laptop to open multiple files on a removable USB storage device with the Volume Serial Number 013AA402. Of the three files shown below, the "contacts.vcf" file contains what is essentially a TETRA customer list maintained by Brown in his TETRA Microsoft account, something David Brown was able to verify from his analysis of Brown's TETRA laptop.

| File Path | Target Created (Central) | Target Last Modified (Central) |
|---|---|---|
| D:\Microsoft Edge Passwords.csv | 03/14/2025 12:58:39 PM | 03/14/2025 12:58:40 PM |
| D:\favorites_3_14_25.html | 03/14/2025 11:23:13 AM | 03/14/2025 11:23:28 AM |
| D:\contacts.vcf | 03/12/2025 10:34:30 AM | 03/12/2025 10:34:32 AM |

David Brown Dec. at ¶ 11.a.

68.    Between March 12, 2025, and March 14, 2025, Brown engaged in additional conduct that shows he viewed and stored or copied TETRA Trade Secret Information. *See* David Brown Declaration at ¶14.a.-k.  For example:

a)    On March 12 at 8:09 AM Central Time, Brown visited his aol email folder that showed 29 items in his "drafts" folder and also showed a new message from his aol email address that contained TETRA information;



b)    Also on March 12, around 8:21and 8:22 AM Central Time Brown viewed an excel file named "2025 Liquid Terminal Std. Cost – 1.2.2025 (0 Mainstream Purchase)" containing TETRA Trade Secret Information and created a new message from his aol email address containing information from the same excel file. Per Tim Moeller, this excel file contains detailed TETRA financial information about costs and margins, among other things, that TETRA protects as confidential and trade secret;





c) Minutes later, Brown copied TETRA Confidential Information from an excel spreadsheet entitled "Full Year 2024 by Ship-To Customer" to another new "draft" message in the Brown AOL Personal Account and by this time, his aol drafts folder contained 31 items containing TETRA information. Per Tim Moeller, this excel spreadsheet contains TETRA's financial and related information about all of TETRA's 2024 shipping to its customers;





d) Also on March 12, 2025, Brown accessed the email contacts associated with his TETRA email address (kbrown@onetetra.com) and attempted to share those email contacts with kent.brown106@gmail.com;

e) Brown then created different files entitled "contacts.vcf" and "contacts.txt" on a USB drive connected to Brown's laptop, apparently to copy his TETRA contacts information to the USB drive;

f)  Also on March 12, around 2:41 PM Central Time, Brown visited his aol email page which by this time contained 32 items in the drafts folder;

g)  On March 13 around 9:40 PM Central Time, Brown deleted his Microsoft Edge browsing data on his TETRA laptop;

h)  On March 14, 2025, at 10:12 AM Central Time, Brown visited a website called "Concur Solutions," that showed a login screen for SAP Concur using the email address KentBrown@onetetra.com and the password "FlatlinePurechem$$";

i)  Also on March 14, Brown attempted to export favorites to an HTML Document named "favorites_3_14_25." He then used a USB drive to create the same file on the USB drive; and

j)  Next, on March 14, Brown created the file "Microsoft Edge Passwords.csv" on a USB drive.

David Brown Dec. at ¶ 14.

69.    Most, if not all, of the files and information that Brown copied into his aol drafts folder, and otherwise took, constitute information that TETRA protects as confidential and trade secret information and that is in fact confidential and trade secret. Brown had access to TETRA's information to perform work for TETRA's benefit. However, Brown abused his access to TETRA's property when he spent the days and weeks prior to his departure collecting TETRA property to use for his own benefit and the benefit of the defendant companies.

70.    Brown never informed anyone at TETRA that he was using external storage devices or copying information into his aol email account in the days and weeks leading up to his departure to transfer TETRA property, nor did he have authority or permission to engage in such conduct. Indeed, Brown's conduct was directly against TETRA's interests.

71.    On March 17, 2024, Brown returned to TETRA a USB flash drive to TETRA, a SanDisk Cruzer Glide with Electronic Serial Number 4C531001430617116034 (the "Brown Flash Drive"). David Brown Dec. at ¶ 4. CyberEvidence found that the Brown Flash Drive was connected to one or more unknown computers on March 17, 2025, none of which were Brown's

TETRA-issued laptops. All of the files on this SanDisk Cruzer Glide USB drive were from 2016. *See* David Brown Dec. at ¶¶ 10-11.

72.     Brown has not returned any of the other USB drives he used to access TETRA information during his TETRA employment, and particularly the USB drives discussed above that Brown used in 2024 and immediately prior to his March 14, 2025, resignation.

**F.    Kilgore's Misuse of TETRA's Computer System to Compete and to Misappropriate TETRA's Trade Secrets.**

73.     The same Computer Use Policy applied to Kilgore's use of TETRA's computer system.

74.     Although David Brown was able to identify multiple USB connections performed with Kilgore's TETRA laptop computer, David Brown was unable to discern more information from these connections, which occurred from March 2023 through October 2023. David Brown Dec. at ¶ 14.

75.     On October 17, 2023, the same day Brown sent to his personal account one of TETRA's master safety data sheets, Kilgore, through his TETRA-issued computer, used TETRA's MSDS for liquid calcium chloride solution as a template to create a Purechem MSDS for magnesium chloride. David Brown Dec. at ¶ 17. The MSDS does not necessarily contain TETRA confidential and trade secret information – but it represents an investment of TETRA time and money that belongs solely to TETRA.

76.     On November 25, 2024, Kilgore sent to his personal Gmail account an Excel spreadsheet entitled "2023 Liquid Terminal Standard Cost 11.2.2020.xlsm." David Brown Dec. at ¶ 16. The file contains a large volume of TETRA financial information, including costs, margin information and calcium chloride solutions concentrations for numerous TETRA client orders.

**G.**    **Brown and Kilgore, using Purechem and Sea-Tex, Continue to use TETRA's Confidential Information in their Competition with TETRA.**

77.    The forensic evidence to date shows that Defendants never intended to compete fairly. Instead, Defendants' "business plan" was to piggyback on TETRA's significant investments and years of hard work to catch an unlawful free ride. To meet that end, Defendants conspired and engaged in coordinated unlawful civil and criminal conduct for months, if not years, with Brown and Kilgore pretending to be loyal TETRA employees while setting up their competition with TETRA and actually engaging in that competition before they resigned.

78.    Defendants conspired to use TETRA's information and unlawfully compete with TETRA and take, or attempt to take, its customers and/or customers' projects. Defendants' unlawful acts started in 2021 and steadily increased throughout 2023 and 2024, as Brown and Kilgore left TETRA and took confidential and trade secret information from it to use for his own benefit and that of the defendant companies.

79.    Currently, Brown and Kilgore, doing business as Sea-Tex and Purechem, are competing with TETRA unfairly, in violation of their contractual, statutory and common law obligations to TETRA, using the confidential and trade secret information they learned at TETRA, and took from TETRA, to advance their businesses to TETRA's detriment.

## V.    <u>CAUSES OF ACTION</u>

**A.**    **Count 1—Against All Defendants: Violation of the Defend Trade Secrets Act.**

80.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

81.    Under the Defend Trade Secrets Act ("DTSA") a trade secret is any information that the owner has "taken reasonable measures to keep such information secret and the information derives independent economic value, actual or potential, from not being generally known to, and

not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

82.    The information that Brown and Kilgore took, as discussed above, qualifies as trade secret because the information derives independent economic value from not being known to TETRA's competitors. The information also is not readily ascertainable through proper means by TETRA's competitors or other third parties.  Further, through its various practices, policies and the contracts with Brown and Kilgore, TETRA has exerted significant efforts to maintain the confidentiality of the information. Not only does TETRA protect that information as secret, but the information is, in fact, secret.

83.    Indeed, Brown and Kilgore misappropriated TETRA's confidential and trade secret information *because* it is information they could not have secured from any other sources, violating their various duties as TETRA employees to surreptitiously steal TETRA's confidential and trade secret information from its computer systems.

84.    Through their conduct described above, and conduct TETRA has not yet discovered, Brown and Kilgore, working in concert on their behalf and on behalf of the Defendant companies, illegally stole, copied, downloaded, transmitted, destroyed, and altered TETRA's trade secrets—in violation of 18 U.S.C. § 1832(a).

85.    Further, Brown and Kilgore's theft of TETRA's trade secret information in violation of the DTSA occurred on multiple discrete dates, beginning in late 2023, continuing in 2024, and culminating with Brown's multiple discrete acts of theft in March 2025. And Brown and Kilgore committed these acts of misappropriation of TETRA's trade secret information for their own benefit, in concert, and for the benefit of their companies Purechem and Sea-Tex.

86.     Accordingly, TETRA seeks injunctive relief to prevent Defendants from any further use of its trade secret information going forward. TETRA likewise seeks injunctive relief requiring the return of all of its property in Defendants' possession. Further, because Defendants *obviously cannot be trusted, the only  way* to secure this relief is for the Court to order Defendants to produce their computers and devices, including the USB devices described above, to TETRA's computer forensics expert for preservation, examination, and analysis.

87.     TETRA also seeks monetary damages for any harm that it has already suffered due to Defendants' misappropriation of its trade secrets. 18 U.S.C. § 1836(3).

88.     Moreover, because Defendants' actions were willful and malicious, TETRA also seeks its attorney's fees and exemplary damages.  *Id.*

## B.     Count 2—Against Kent Brown and Shannon Kilgore: Breach of Contract.

89.     TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

90.     The Employment Agreements are valid and enforceable contracts. *See* Exhibits D and E.

91.     TETRA entered the Employment Agreements with Brown and Kilgore to protect its business goodwill, customer relationships, trade secrets, and other commercially sensitive business information. TETRA performed all of its obligations under the Employment Agreements. In return for access to and use of TETRA's trade secrets and business goodwill, Brown and Kilgore agreed not to use for their own benefit or for the benefit of another, or to disclose, any trade secret or confidential information of TETRA, its customers, contractors, or others with whom TETRA has business relationships. Exhibits D and E ¶¶ 7.

92.    Paragraph 7 of the Employment Agreements also require Brown and Kilgore to return all TETRA property upon termination of their employment – which they obviously have not done.

93.    Brown and Kilgore also agreed not to be directly or indirectly connected with or concerned in any other business which competes in a way with TETRA while employed at TETRA. Exhibits D and E ¶¶ 6.

94.    Throughout their employment, and specifically leading up to their resignations, Brown and Kilgore took, used, and disclosed TETRA's trade secrets and confidential information, including TETRA's customer and financial information, violating their contractual obligations not to use or disclose TETRA's confidential information.

95.    They also have not returned the TETRA property they possess, which is another discrete violation of their Employment Agreements.

96.    While working at TETRA, Brown and Kilgore both formed and operated businesses which competed and continue to compete with TETRA since 2020, which is yet another discrete violation of the Employment Agreements.

97.    Brown and Kilgore's breaches of their contractual obligations to TETRA has already caused TETRA to suffer monetary damages, including TETRA's loss of business associated with its loss of the Mainstream contract, which it cannot currently calculate, but which it seeks to recover in the form of compensatory damages at trial of this matter.  TETRA's damages also include all compensation Brown and Kilgore "earned" from Sea-Tex, Purechem, and elsewhere resulting from their contractual breaches and further includes all compensation TETRA paid these disloyal employees from the time they began actively competing with TETRA in violation of their contractual obligations.

98.    There is also a substantial risk – based on Defendants' brazen breaches of their Employment Agreements – that unless enjoined, Defendants will continue to violate their contractual obligations to TETRA by: (a) wrongfully retaining its property; (b) continuing to benefit from their contractual breaches; and (c) continuing their misuse of TETRA's confidential information to compete unfairly with TETRA.

99.    Therefore, TETRA seeks a temporary restraining order, preliminary injunction, and permanent injunction enjoining Brown and Kilgore from continuing, and benefitting from, their violations of the Employment Agreements.

**C.    Count 3—Against Kent Brown and Shannon Kilgore: Breach of Fiduciary Duty/Duty of Loyalty.**

100.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

101.    TETRA reposed significant trust in Kilgore and Brown during their employment at TETRA.  Both were management level employees for TETRA, trusted with critical responsibilities for TETRA and access to and use of TETRA's confidential and trade secret information.  Indeed, TETRA permitted them to work independently with little supervision and trusted them with close contact, and negotiation authority, with TETRA's customers, suppliers, and distributors.

102.    TETRA trusted Brown and Kilgore to protect and develop TETRA's business interests and act in the best interest of it at all times.  For these reasons, Brown and Kilgore were, whether formally or informally, fiduciaries to TETRA and owed TETRA duties of loyalty inherent in the employment relationship. Brown and Kilgore were also fiduciaries to TETRA because each held a management position with the Company.  They were, therefore, required to deal in the best of good faith with TETRA and to refrain from self-dealing.

103.    As described above, Brown and Kilgore engaged in self-dealing and other conduct that was directly contrary to TETRA's interest by competing with TETRA during their employment by TETRA and stealing its property. Brown and Kilgore diverted business away from TETRA, while employed at TETRA, through, among other things, their involvement in TETRA's Mainstream Agreement renewal negotiations and their actions taken on behalf of Sea-Tex to successfully obtain the benefits of the same contract, while essentially sabotaging TETRA's chances at renewal. Thus, Brown and Kilgore have breached their fiduciary duties by the conduct described above.

104.    TETRA requests the equitable remedy of disgorgement against Brown and Kilgore to prevent Brown and Kilgore from profiting from their breaches. Specifically, TETRA requests that the Court order Brown and Kilgore, and the Defendant companies they control, to disgorge any profits made from their ill-gotten gains, "earned" by virtue of Brown and Kilgore's breaches of their fiduciary duties to TETRA.

105.    Because Brown and Kilgore breached their fiduciary duties to TETRA while TETRA was paying their compensation, Brown and Kilgore wrongly received and retained all such pay, which should be deemed to be held in constructive trust for TETRA. As part of its damages to be proven at trial, TETRA requests that the Court order Brown and Kilgore to return all salary and wages TETRA paid them during which the period that there were actively working against TETRA's interests in furtherance of their own.

106.    Further, given TETRA's policies articulated above, Brown and Kilgore clearly knew that their conduct was starkly against TETRA's interests and in violation of their duties of loyalty.  Thus, Brown and Kilgore committed their actions with legal malice, such that TETRA is

entitled to recover, and requests, exemplary damages pursuant to Texas Civil Practice and Remedies Code § 41.001 *et. Seq.*

**D.    Count 4—Against all Brown, Kilgore and Sea-Tex: Tortious Interference with Contractual and Business Relations.**

107.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

108.    Until January 1, 2025, TETRA was party to a contract with Mainstream under which Mainstream would source calcium chloride from Honeywell's Baton Rouge plant and sell that calcium chloride to TETRA.  TETRA would then, using Triad, have that product delivered to its customers.

109.    While employed at TETRA, Brown and Kilgore, acting for themselves and for Sea-Tex, intentionally and wrongfully solicited Mainstream's calcium chloride production which was held by TETRA at the time. Brown, as TETRA's lead negotiator on the Mainstream Agreement renewal, was simultaneously interfering with TETRA's negotiations with Mainstream by delaying an agreement and working in secret to achieve a contract for Sea-Tex.

110.    Kilgore also worked to interfere with TETRA's Mainstream contract during his employment, as evidenced by his discussions recounted above with Brady Achee, Triad's owner. And after Kilgore began these discussions, Brown took over the Triad relationship for Sea-Tex even while he was posing as a loyal TETRA employee and fiduciary.

111.    Brown, Kilgore and Sea-Tex knew and intended that their actions would interfere with TETRA's existing business and contractual relationships with Mainstream, and the customers who were receiving the Mainstream calcium chloride production from TETRA. Brown, Kilgore and Sea-Tex's actions were performed without justification or privilege with the intent to harm TETRA and benefit themselves at the expense of TETRA.

112.    As a direct and proximate result of Brown and Kilgore's tortious interference, TETRA has suffered economic harm, including, but not limited to, lost profits and business disruption in an amount to be proven at trial.

113.    Brown, Kilgore and Sea-Tex's conduct was willful, intentional, and performed in reckless disregard of TETRA's rights, causing significant harm to TETRA for which TETRA seeks compensatory and punitive damages in an amount to be determined at trial.

**E.    Count 5—Against All Defendants: Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")**

114.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

115.    As outlined above, Defendants participated in a scheme to defraud TETRA. Brown and Kilgore fraudulently held themselves out as TETRA's loyal employees while engaged in multiple discrete acts of trade secret theft, as described above, in violation of the DTSA. Brown and Kilgore engaged in this conduct for their own benefit, and for the benefit of Sea-Tex and Purechem, fully coordinated to achieve their illegal purposes.  Thus, all four Defendants acted as an "enterprise" engaged for one purpose – to steal TETRA's trade secret information and use that information to compete unfairly with TETRA, both during Brown's and Kilgore's TETRA employment, and after.

116.    Indeed, Defendants engaged in far more than two discrete acts of trade secret misappropriation in violation of the Defend Trade Secrets Act. 18 U.S.C. §§ 1832, *et seq.*  These multiple acts of trade secret misappropriation constitute discrete predicate racketeering acts under 18 U.S.C. § 1962(c), as defined under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C § 1961(1). Defendants also committed wire fraud by using electronic communications to intentionally defraud TETRA of its property. *See* 18 U.S. Code § 1343, *et. seq.*

117.     Brown and Kilgore, through an association-in-fact enterprise, used Sea-Tex, Flatline, and Purechem to conduct an illegal and fraudulent enterprise in violation of RICO. Specifically, aside from their multiple DTSA violations, also in violation of the Wire Fraud Statute, the Brown and Kilgore loaded their personal and non-TETRA-related electronic devices and accounts with TETRA's proprietary, confidential, protected trade secrets and other commercially sensitive business information prior to terminating their employment with TETRA. Brown and Kilgore acted for their own and their companies' advantage and to the disadvantage of TETRA. Indeed, these actions were many and began months, and even years, before Brown and Kilgore left TETRA.

118.     Purechem  and Sea-Tex are enterprises that engage in interstate commerce. Indeed, both are enterprises that were set up to compete with TETRA. Defendants conspired and acted in violation of 18 U.S.C. § 1962(d) by participating in a pattern of interstate racketeering activity. The individual Defendants communicated, and all Defendants worked together throughout an extended period, to deprive TETRA of its trade secrets and proprietary information, to repackage TETRA's trade secret information as though that information belonged to Sea-Tex and Purechem, and to defraud and harm TETRA in the market.

119.     Accordingly, TETRA seeks all available statutory remedies, actual, treble, and punitive damages, and any other remedy to which TETRA may be justly entitled, to address Defendants'' RICO violations.

**F.     Count 6—Against All Defendants: Violation of the Texas Harmful Access by Computer Act.**

120.     TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

121.    The Texas Harmful Access by Computer Act ("HACA") states, "[a] person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner." Tex. Pen. Code Ann. § 33.02(a). TETRA owns computers and a computer network that TETRA employees are authorized to use to perform TETRA-related work and to further TETRA's business across the United States.

122.    Brown and Kilgore acted outside the course and scope of their employment when they used TETRA's computer system to set up and advance their competing business and to misappropriate TETRA's trade secrets and proprietary information "without the *effective* consent" of TETRA. Their conduct was directly contrary to the authorized use of TETRA's computer network.

123.    Indeed, Brown and Kilgore intentionally and knowingly accessed TETRA's computer system without effective consent. Both Defendants knew that their conduct violated TETRA's policy and exceeded their authorization.  Indeed, Brown erased his browser history in a classic "cover your tracks" effort because he knew what he was doing violated TETRA's policies (not to mention various laws and his contract).  Nonetheless, Defendants acted in furtherance of their conspiracy to defraud TETRA and to steal TETRA's trade secrets and proprietary information, all for the benefit of the defendant companies and in direct detriment of TETRA.

124.    Accordingly, TETRA seeks a judgment that Defendants violated the Texas Harmful Access by Computer Fraud Act. TETRA further seeks actual damages and reasonable attorney's fees and costs pursuant to Section 143.002 of the Texas Civil Practice & Remedies Code.

**G.    Count 7—Against All Defendants: Tort of Misappropriation.**

125.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

126.    Federal and Texas common law recognize the tort of misappropriation. *See International News Service v. Associated Press*, 248 U.S. 215, 39 S. Ct. 68, 63 L. Ed. 211 (1918). *See also United States Sporting Prods. v. Johnny Stewart Game Calls*, 865 S.W.2d 214, 218 (Tex. App. 1993). The tort of misappropriation protects against the theft of information that may not be trade secret, but still retains economic value and advantage – such as TETRA's MSDS. *Johnny Steward Game Calls*, 865 S.W. 2d at 219.

127.    TETRA created unique information through the expenditure of extensive time, labor, skill, and money. TETRA's information and documents are valuable assets of TETRA because the company derives economic value from them. Given the value of the information and documents, TETRA has taken reasonable steps to protect them and only permitting that only certain individuals, including TETRA's employees, access these documents and information through TETRA's computer system for purposes of advancing TETRA's business.

128.    Having conspired to create and benefit the company defendants, Defendants misappropriated TETRA's proprietary information and documents and used them to gain a foothold. Indeed, Defendants took a free ride and gained a special advantage over TETRA, as they created "new" Purechem material but avoided the substantial costs associated with developing the information. Defendants have obtained and will obtain economic value from the use of TETRA's information and documents because they are using TETRA's information as their own to secure business from customers, among other things.

129.    Defendants have caused, and continue to cause, economic damage to TETRA. Accordingly, TETRA seeks injunctive relief restraining Defendants' conduct, disgorgement of all profits Purechem, Sea-Tex, or Flatline realized in performing services with TETRA's property, and damages, including punitive damages, as well as and any other remedy to which TETRA may be justly entitled.

## H.     Count 8—Against All Defendants: Civil Conspiracy.

130.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

131.    Defendants were members of a common conspiracy. The object of the conspiracy was to accomplish unlawful purposes, including: to steal and continuously misuse TETRA's proprietary information, to breach their fiduciary duties, and to defraud TETRA.

132.    Defendants had a meeting of the minds to engage in the course of action described above in order to further the business of Purechem, Sea-Tex and Flatline, and to harm TETRA's economic interests.

133.    As described above and below, Defendants defrauded TETRA and committed the overt acts of theft and breach of fiduciary duty.

134.    Defendants' conspiracy has proximately caused injury to TETRA for which TETRA seeks to recover compensatory and consequential damages. Additionally, because Defendants defrauded TETRA and committed their conspiracy and fraud with malice, TETRA seeks to recover exemplary damages pursuant to Section 41.001, *et seq.*, of the Texas Civil Practice & Remedies Code.

I.      **Count 9 – Against All Defendants: Conversion.**

135.    TETRA, without waiving the foregoing, realleges and incorporates the allegations set forth above.

136.    All information included in the documents that the individual Defendants took is the exclusive property of TETRA.

137.    Defendants have wrongfully converted TETRA's property for their own use and intend to use TETRA's property in a manner that is inconsistent with TETRA's rights.

138.    Because of Defendants' actions, TETRA has suffered and/or will continue to suffer compensatory damages and irreparable harm and loss.

## VI.      <u>TETRA'S NEED FOR A TRO AND PRELIMINARY INJUNCTION</u>

139.    As set forth above, and in TETRA's Motion for Temporary Restraining Order and Preliminary Injunction, filed concurrently with this Complaint, there is a inescapable risk – based on Defendants' brazen misappropriation of TETRA confidential information and trade secrets and breaches of the Employment Agreements, among other illegal conduct – that unless enjoined, Defendants will continue to violate their statutory, contractual, and common law obligations to preserve the "free ride" they have stolen from TETRA. Therefore, TETRA seeks a temporary restraining order, preliminary injunction and permanent injunction enjoining Brown and Kilgore and the other Defendants as requested below.

140.    Absent injunctive relief, TETRA is faced with irreparable injury without any adequate remedy at law because the difficulty in ascertaining the full measure of harm Defendants inflicted by their various breaches, theft and conspiracy renders any amount of monetary damages insufficient to compensate TETRA for its losses. Further, as briefed in TETRA's Motion for Temporary Restraining Order and Preliminary Injunction, TETRA meets all of the necessary

standards for the imposition of urgent temporary injunctive relief.  It has demonstrated a probable right to relief on the merits of at least some of its causes of action (if not all), the issuance of injunctive relief serves both the balance of the equities and the public interest in preventing the sort of conduct described in this Verified Complaint.

## VII.    PRAYER FOR RELIEF

TETRA respectfully requests that the Defendants be cited to appear and answer, and respectfully requests that this Court award:

(1)    A Temporary Restraining Order followed by a Preliminary Injunction

    a. Requiring Defendants to immediately produce to TETRA's third-party computer forensics expert David A. Brown, at CyberEvidence, for forensic imaging and analysis all computers, computer systems, USB devices and other devices that have ever contained any TETRA information;

    b. Requiring Defendants to immediately produce all TETRA confidential and trade secret information in their possession, custody or control that is not on any of the above identified computers and devices to TETRA's third-party computer forensics expert David A. Brown, at CyberEvidence;

    c. Requiring Defendants to immediately cease all use and disclosure of TETRA confidential and trade secret information, whether tangibly in their possession or not;

    d. Requiring Defendants to immediately cease doing business with all business relationships, whether customers, suppliers, or vendors, that they learned of while employed by TETRA and are currently doing business with, or have attempted to do business with; and

    e. Requiring Defendants to refrain from the destruction of any evidence potentially relevant to TETRA's Complaint.

(2)    Judgment against Defendants for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836;

(3)    Judgment against Defendants for violation of the Racketeer Influenced and Corrupt Organizations Act;

(4)    Judgment against Defendants for violation of the Texas Harmful Access by Computer Act;

(5)     Judgment against Defendants for the tort of misappropriation;

(6)     Judgment against Defendants for civil conspiracy;

(7)     Judgment against Defendants for conversion;

(8)     Judgment against Defendants for tortious interference;

(9)     Judgment against the Kent Brown and Shannon Kilgore for breach of fiduciary duty;

(10)    Judgment against Kent Brown and Shannon Kilgore for breach of contract;

(11)    Damages suffered as a result of Defendants' actions, including but not limited to actual, punitive and treble (under RICO) damages;

(12)    A permanent injunction against all Defendants mirroring the requested TRO and Preliminary Injunction;

(13)    Costs and attorneys' fees;

(14)    Pre-judgment and post-judgment interest as provided by law; and

(15)    All other relief to which TETRA may be justly entitled.

Respectfully submitted,

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

By: */s/ Scott R. McLaughlin*
Scott R. McLaughlin
Attorney-in-Charge
Texas Bar No. 00791234
Federal ID No. 18138
scott.mclaughlin@ogletreedeakins.com
One Allen Center
500 Dallas Street, Suite 2100
Houston, Texas 77002
Telephone:  (713) 655-5752
Facsimile:  (713) 655-0020

**ATTORNEYS FOR PLAINTIFF TETRA TECHNOLOGIES, INC.**

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on this 31st day of March, 2025, a true and correct copy of the foregoing document was filed with the Court's Electronic Case Filing system, and that undersigned counsel has emailed a copy of this Complaint to all Defendants to all email addresses TETRA has for them and by hand-delivery to their home or business addresses.

*/s/Scott R. McLaughlin*
Scott R. McLaughlin
